UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:15-cr-212-SM |
| | ) | |
| EDWARD McLARNON | ) | |

## GOVERNMENT'S MEMORANDUM ON "EXPLOSIVE GRENADE[S]"

The United States of America, by John J. Farley, Acting United States Attorney, and his

assistants John S. Davis and Matthew T. Hunter, states:  In this firearms and explosives case, the

defendant, Edward McLarnon, received two M67 grenades that contained inert fuzes installed by

the FBI for safety reasons.  The Court has raised the issue whether, notwithstanding the "inert"

character of the fuzes in the grenades used, the defendant may be prosecuted for receipt of an

unregistered "firearm" under 26 U.S.C. §§ 5861(d).  As shown below, the grenades are

"destructive devices" under 26 U.S.C. §§ 5845(f) and therefore are "firearms" regulated under

the National Firearms Act ("NFA"), because they are "explosive . . . grenades" under §

5845(f)(1)(B), and were "designed" as weapons and never "redesigned" for use in a non-military

context.

### I.    Facts

As shown by the evidence at trial, an undercover FBI agent sold Defendant McLarnon

two live M67 fragmentation grenade bodies with inert M213 fuzes.  The M67, a standard

weapon of the U.S. Armed Forces, appears as a 2.5-inch diameter steel sphere weighing 14 oz.,

and is designed to burst into numerous fragments when detonated.  Prior to the operation,

personnel from the FBI's Explosives Unit received the grenades from the Ammo Supply Point at

the Marine Corps Base in Quantico, Virginia.  The live fuzes in the grenades were removed and

replaced with inert fuzes, which looked identical to live fuzes, but did not contain detonator

explosives and therefore would not function.  The FBI made no other modifications to the

grenades, each of which contained approximately 6.5 oz. of Composition B high explosive.

## II.      Statutory Framework

The National Firearms Act makes it unlawful to receive or possess an unregistered

"firearm."  26 U.S.C. §§ 5861(d).  The term "firearm" includes a "destructive device."  26

U.S.C. §§ 5845(a)(8).  "Destructive device," in turn, means "any explosive . . . grenade" or

"similar device."  Section 5845(f)(1)(B), (F).  Further, the term "destructive device" does not

include:

- "any device which is neither designed nor redesigned for use as a weapon";

- "any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device";

- "surplus ordnance sold, loaned, or given" by the Army pursuant to certain federal laws; or

- "any other device which the [ATF Director] finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes."

26 U.S.C. § 5845(f).  *See also* 27 C.F.R. § 479.11 (containing essentially identical definition of

"destructive device").[1]  Thus, the present legal issue is whether the devices constitute "explosive

grenades" under the statute, and, if they do, whether they fall under one of the listed exclusions

from the definition.

   III.   **Analysis**

        A. **The M67 Grenades In This Case Are Objectively Identifiable Items of
           Military Ordnance and Remain "Explosive Grenades" Under the NFA
           Since An Inoperable Weapon May Still Be a "Firearm."**

Beginning with § 5845's text and context, the devices in question are readily identifiable

as "explosive grenades," since they are paradigmatic (albeit altered for safety reasons) examples

of hand grenades in use by the U.S. military.  Under § 5845(f)(1) and (2), grenades are part of a

category of "major destructive devices such as bombs, grenades, mines, rockets, and [certain]

large caliber weapons." *United States v. Freed*, 401 U.S. 601, 616 (1971) (Brennan, J.,

concurring).  Congress' inclusion of these items within the NFA "was prompted by the influx of

surplus military weapons into this country from other nations," and was "intended to bring

---

[1] The structure of the definition of "destructive device" in § 5845(f) corresponds to the definition
of "military munitions" in 10 U.S.C. § 101, which sets out definitions for statutes concerning the armed
forces.  That section defines "military munitions" based on how they are used or what they are designed
to do:  "all ammunition products and components *produced for or used by* the armed forces for national
defense and security."  10 U.S.C. § 101(e)(4)(A).  Then, after listing specific examples—including
grenades, *id.* § 101(e)(4)(B)(iii)—the statute specifically excludes from the definition: (i) "*[w]holly inert
items*"; (ii) improvised explosive devices ("IED"); and (iii) nuclear weapons.  *id* § 101(e)(4)(C) (emphasis
added).

   Notably, a partially inert munition is still a "military munition" under section 101.  Moreover,
although 10 U.S.C. § 101 excludes IEDs from the definition of "military munition," 26 U.S.C. § 5845(f)
defines "destructive device" to include not only military munitions, § 5845(f)(1), but also IEDs through
the "combination of parts" analysis in § 5845(f)(3).  Put another way, § 5845(f) does not *narrow* the
definition of military munitions, but expands it to include IEDs and other devices that, though not
military-designed weapons, are designed for a similar use.

within the Act items of heavy military ordnance that had no legitimate private use and constituted a substantial threat to public safety." *United States v. Oba*, 448 F.2d 892, 897 (9th Cir. 1971) (Browning, J., dissenting on other grounds).[2] Items in this category are "military-type weapons" that are "objectively identifiable weapons of war." *United States v. Posnjak*, 457 F.2d 1110, 1115, 1116 (2d Cir. 1972); *see Oba*, 448 F.2d at 899 (Browning, J., dissenting) (recognizing that items listed in "destructive device" definition are "specific, objectively identifiable" items of "military ordnance"). *Cf. United States v. Markley*, 567 F.2d 523, 528 (1st Cir. 1977) (holding that homemade device consisting of sealed cardboard tube containing explosive black powder was "explosive bomb" or "similar device" under § 5845(f)(1)); *United States v. Curtis*, 520 F.2d 1300, 1304 (1ˢᵗ Cir. 1975) (holding that home-made time bomb was "explosive bomb" even though its explosive power was derived from commercial dynamite).[3]

---

[2] *Oba* was a "combination of parts" case where the majority held that a homemade explosive that included commercially available dynamite was a "destructive device." The dissent argued for a narrower reading of the NFA to apply only to "gangster-type weapons and *military ordnance* specifically described in the Act," and not to "extend to ordinary commercial blasting materials such as those involved here." *Oba*, 448 F.2d 892, 898 (emphasis added) (Browning, J., dissenting) ("Congress intended to add only military ordnance having little or no appropriate civilian use, and not such common commercial explosives as those involved here."). However, the majority rejected such a narrow reading of "destructive device," reasoning:

> The definition excluded "any device, although originally designed for *use* as a weapon, which is *redesigned* for use as a signaling, pyrotechnic, line throwing, safety, or similar device." Here, appellant's own admission establishes that the weapon in issue had not been redesigned for any such use.

*Id.* at 894 (emphasis in original). The grenades in this case are a "destructive device" under both approaches: they are military ordnance that have not been "redesigned" at all, much less redesigned for a use specified in § 5845(f). *See* Section II.B *infra*; 10 U.S.C. § 101(e)(4)(B)(iii); 26 U.S.C. § 5845(f).

[3] The grenades here qualify as destructive devices under § 5845(f)(1) (listing specific military-type weapons), and thus, the "combination of parts" definition of destructive device is inapplicable. *See United States v. Johnson*, 152 F.3d 618, 627 (7th Cir. 1998) ("when a device is completely assembled, the appropriate course is to proceed under subpart (1)"). That is, the issue here is whether the devices delivered to the defendant were in fact "explosive grenades" under (f)(1), not whether those same devices were accompanied by other "parts" "designed or intended for use in converting" them into qualifying destructive devices, such that "explosive grenades" could be "readily assembled," as set forth in

Section 5845 does not define the terms "explosive" or "grenade." Thus, the Court should not supply a technical definition of the words, but should instead instruct the jury that such terms should be understood as they are commonly used. *See United States v. Mena*, 933 F.2d 19, 27 (1st Cir. 1991) ("In the absence of a statutory definition, it seems to us more likely that Congress used the word 'flammable' not in the precise scientific sense, but intending to denote the word's common usage . . . ."); *Markley*, 567 F.2d at 528 (upholding instruction that jury must find "that the devices in question are explosive bombs in and of themselves," without further definition of term "bomb").[4]

Importantly, unlike other parts of § 5845, the phrase "explosive grenade" does not include a "test of objective capability." *See United States v. Crooker*, 608 F.3d 94, 98 (1st Cir. 2010) (noting that machine-gun provision, in contrast to "silencer" definition, is based on particular weapon's capability). Thus, a "machinegun" means a weapon "which shoots, is designed to shoot, or can be readily restored to shoot" automatically by a single trigger pull. 26 U.S.C. § 5845(b). The phrase "any other weapon" includes certain devices "from which a shot can be discharged through the energy of an explosive." 26 U.S.C. § 5845(e). And a bazooka or other large-bore destructive device must be one that "will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant." 26 U.S.C. § 5845(f)(2). By

---

subsection (f)(3). *See id.* at 627-28 ("When the defendant possesses parts susceptible to both a destructive and constructive use . . . further inquiry is necessary in order to ensure that the individual who uses such material to achieve a good social or commercial purpose is not subject to criminal liability."). Because no other "parts" besides the grenades themselves were present, subsection (f)(3) is inapplicable.

[4]The question of whether a particular item constitutes a "firearm" is one of fact, to be determined by the jury. "While the determination of what constitutes a firearm under the relevant statute is a question of law, the determination of whether a particular weapon fits within the legal definition of a firearm under that statute is a question of fact." *United States v. Yannott*, 42 F.3d 999, 1005 (6th Cir. 1994). *See also Johnson*, 152 F.3d at 626 (noting that issue of weapon's "design" is question of fact for jury).

contrast, under the statutory definition an "explosive grenade" need not be shown to function in any particular way, so long as it is proved to be the thing itself.  Put another way:  a machinegun is defined by what it *does*; a grenade by what it *is*.  *See United States v. Rushcamp*, 526 F.2d 1380, 1382 (6th Cir. 1975) (quoting district court's finding that rocket launcher was "exactly the 'military-type' weapon that the statutes speak of"); *United States v. Melancon*, 462 F.2d 82, 96 (5th Cir. 1972) (regarding Japanese mortar for which no ammunition was available:  "Within the plain words of the statute, the weapon was there").

At least at first glance, then, the devices the FBI sold to the defendant were quintessentially the "explosive . . . grenades" identified in the statute, because they were actual M67 grenades used by the Army, and the statute does not require that they be shown to perform in any specific way.

Still, the defendant may contend that since the grenades' live fuzes had been replaced with inert ones and were therefore inoperable, the devices did not meet the definition of "explosive grenade."  In analogous contexts, however, the First Circuit has given short shrift to the notion that "operability" is a required element in firearms cases.  Thus, a "firearm" must be "real," rather than a toy or replica, but it need not be proved to be loaded or operable.  *United States v. Martinez-Armestica*, 846 F.3d 436, 440 (1st Cir. 2017) (§ 924(c) conviction).  *See also United States v. Alston*, 112 F.3d 32, 33-35 (1st Cir. 1997) (affirming conviction for being felon in possession of inoperable firearm that was "rusted and pitted," with no magazine and a slide "rusted solid"); *United States v. Kirvan*, 997 F.2d 963, 966 (1st Cir. 1993) (noting "common ground that the gun need not be proved to be loaded or operable in order to convict," but that "a toy or replica will not do").

- 6 -

The same principle applies to machineguns.  In *United States v. Pena-Lora*, 225 F.3d 17, 31-32 (1st Cir. 2000), the court held that an inoperable UZI submachinegun qualified as a "machinegun" under section 924(c) even though a weapons expert testified that it had been damaged or clogged and could not be fired until repaired.  The First Circuit joined the numerous courts that had so held, noting the broad definition of "machinegun" in § 923(a)(23), which includes any weapon that shoots, is designed to shoot, *or* can be readily restored to shoot, automatically more than one shot, without manual loading, by a single function of the trigger. 225 F.3d at 31.

Similarly, in *United States v. Veilleux*, 40 F.3d 9, 10 & n.1 (1st Cir. 1994), the court questioned the government's concession that it was required to prove a firearm's operability, and cited *United States v. Ruiz*, 986 F.2d 905, 910 (5th Cir. 1993), for the proposition that under § 923(a) "the government need not prove that the gun is *capable* of firing so long as it demonstrates that it was *designed* to fire."  *See also United States v. Padilla*, 393 F.3d 256, 258 (1st Cir. 2004) (where defendant's gun lacked a firing pin assembly and magazine, holding that district court's failure to give jury instruction addressing whether weapon was "firearm" under § 921(a)(3) was not an abuse of discretion, and citing *United States* v. *Brown*, 117 F.3d 353, 355 (7th Cir. 1997),[5] in support of  instruction actually given), *vacated on other grounds*, 403 F.3d

---

[5] In *Brown* the Seventh Circuit upheld the lower court's application of the definition of "firearm" in U.S.S.G. § 1B1.1, which mirrored the definition of  the same term in § 921(a)(3), and applied a firearms enhancement even though an undercover agent had removed the firing pin from the gun he provided to the defendant.  The court noted that § 921(a)(3) did not require operability, and that a number of courts have held that "damage to or removal of a firing pin does not bring a weapon outside the statute's broad definition of firearm."  117 F.3d at 355.  The defendant argued that the undercover officer's intentional removal of the firing pin rendered it no longer "designed to" expel a projectile.  The court assumed without deciding that a weapon originally designed to expel a projectile may reach a point at which it is no longer "designed" to do so, but did not agree with Brown "that the line is crossed with the removal of a gun's firing pin."  117 F.3d at 355.  The court stated that "an alteration that renders a weapon inoperable

780 (1st Cir. 2005); *United States v. Luce*, 726 F.2d 47 (1st Cir. 1984) (holding that "silencer" transferred in unassembled component parts was still a "firearm"). *Cf. United States v. McKlemurry*, 461 F.2d 651, 652-53 (5th Cir. 1972) (in stolen automobile case, holding that automobile vehicle lacking a motor was still a "motor vehicle" as defined under 18 U.S.C. § 2311).

*Brown*'s recognition that a "firearm" may be altered without losing its statutory identity is crucial. 117 F.3d at 356. Since any weapon may undergo changes from its original state, the question must be one of degree. Nearly everyone would agree, for example, that a functioning M67 grenade, hand-painted purple instead of the standard olive drab, would not by virtue of its new paint job become something other than an "explosive grenade" under § 5845(f)(1)(B). And if the painting of a grenade effects no material change in its identity, it is not evident why the replacement of a grenade's live fuze with an inoperable one – as in this case – would transform an "explosive grenade" into something else. *See United States v. Sheehan*, 838 F.3d 109 (2d Cir. 2016) (bomb with inoperable fuzing system still an "explosive bomb" where it is "capable of detonating" via other means); *Ruiz*, 986 F.2d at 910 ("the filing down of the gun's hammer did not change the fact that the gun was designed to expel a projectile, but rather it merely temporarily altered the gun's capability to accomplish the purpose for which it was designed").

Indeed, the view that a grenade with an inoperable fuze is not a grenade would have serious implications for law enforcement. It would permit a possessor of an otherwise live and lethal grenade to evade prosecution under the NFA simply by removing the device's fuze and

---

cannot by itself remove the weapon from the Guidelines' firearm definition if the alteration does not preclude the weapon's being readily converted to operability." Thus, "the removal of a gun's firing pin is not so significant an alteration as to exclude the gun from the definition of firearm." 117 F.3d at 356.

storing the fuze in a distant place.  In such a case, the defendant might successfully claim that the

de-fuzed weapon was not a "grenade" under the NFA, and that the separation of grenade and

fuze made "ready assembly" of a functioning device impossible.  It seems unlikely that Congress

could have intended such a perverse result.

In light of the near-universal consensus in other contexts that an inoperable item does not

necessarily lose its character as a "firearm," one might expect that courts would have little

difficulty concluding that an otherwise "real" grenade with a non-functioning fuze is still a

"grenade" under the NFA.  In several cases, however, courts have reversed convictions based on

"inert" grenades or bombs.  *See United States v. Osuna*, 189 F.3d 1289 (10th Cir. 1999); *United

States v. Blackburn*, 940 F.2d 107 (4th Cir. 1991); *United States v. Malone*, 546 F.2d 1182 (5th

Cir. 1977).  *See also United States v. Lockwood*, 789 F.3d 773, 779 (7th Cir. 2015) (stating that

to prove that object is a "destructive device" under subpart (f)(1), government must show that

item "was fully assembled and could detonate").[6]  *But see United States v. Kiliyan*, 456 F.2d 555

(8th Cir. 1972) (upholding convictions for making and transferring two hand grenades even

though they did not explode when tested).  But, as shown below, these out-of-circuit cases are

readily distinguishable and do not resolve the issue, because in one of them the government

confessed error and there was no real judicial analysis of the issue, and in two others, unlike the

---

[6]*Lockwood*'s assertion that the government must prove that a destructive device under subsection (f)(1) "was fully assembled and could detonate" is of dubious origin, since neither of the two cases the court cited supports that pronouncement.  *See Johnson*, 152 F.3d at 623 (explaining that a destructive device under subsection (f)(1) "may be a fully assembled device, such as a bomb or similar device," but *not* stating that an (f)(1) device must be proved to be operable); *United States v. Strache*, 202 F.3d 980, 986-87 (7th Cir. 2000) (applying "combination of parts" reasoning to affirm "destructive device" sentencing enhancement based on non-functional homemade grenades). In any event, the quoted statement is no more than dicta, since the defendant had stipulated that he possessed an "explosive bomb" that was a "destructive device," and the *Lockwood* court affirmed on the basis of the stipulation.  789 F.3d at 780.

grenades here, the grenades did not contain an explosive charge and the courts relied on the

inapplicable "combination-of-parts" concepts under subsection (f)(3).

In *United States v. Malone*, 546 F.2d 1182 (5th Cir. 1977), the defendant possessed in his

automobile a pressure release spring-top box containing a military MK2 fragmentation hand

grenade hull, inserted rigidly to the inside of the box, miscellaneous electrical wires inserted into

the top of the hand grenade body, a micro-switch, an electrical solenoid switch, a transistor

battery, a small low voltage electrical bulb, glue, tape, small aluminum metals, nails,

waterproofing spray, and a container of Play-doh modeling compound.  But he did not possess

any explosive charge.  The appeals court reversed his conviction because the defendant did not

possess all of the component parts from which a destructive device might be readily assembled.

546 F.2d at 1184.  Critically, however, *Malone* was indicted as a "combination of parts" case

under subsection (f)(3), and did not involve a completed device under subsection (f)(1).  546

F.2d at 1183.  *Malone* thus recognizes the unexceptional proposition that under subsection (f)(3)

the defendant must possess a "combination of parts," including any necessary explosives,

sufficient to permit him to "readily assemble" a destructive device.  But *Malone* does not also

hold that an object specified in subsection (f)(1) must be proved to be "operable" to qualify as a

destructive device.

*Malone* was followed by *Blackburn*, in which the Fourth Circuit held that inert grenades

were not "destructive devices" under the sentencing guidelines.  940 F.2d at 110.  In the course

of a reverse sting operation, an uncover agent removed two grenades from a case of thirty (for

the supposed purpose of murdering a policeman), then placed the case of grenades in the

defendant's truck.  Only the two grenades removed by the agent were live; the other 28 "lacked

powder and were incapable of being detonated." 940 F.2d at 108. After the sentencing court counted all thirty of the grenades as destructive devices, the appeals court vacated the sentence, stating that a defendant may be penalized under the guideline "for only that number of destructive devices which may be 'readily assembled' from the parts in his possession. A defendant must possess *every* essential part necessary to construct a destructive device." 940 F.2d at 110. The *Blackburn* court cited *Malone*, along with two other combination-of-parts cases, *Posnjak* and *United States v. Davis*, 313 F. Supp. 710, 713 (D. Conn. 1970), in support of its holding. But those supporting cases are inapt here, since each turned on subsection (f)(3)'s language and the concept of "ready assemblage," not (f)(1). Because *Blackburn* involved grenades that "lacked powder" and relied on combination-of-parts caselaw, the *Blackburn* court never addressed the type of device here: an objectively identifiable live military grenade with an inoperable fuze. Thus, the Court did not address the argument that an "explosive grenade" under subsection (f)(1) does not lose its identity as a "destructive device" merely because its fuze mechanism has been made inoperable.

Finally, in *Osuna*, an undercover agent sold nine "inert" grenades to the defendant, and the sentencing court counted all nine as destructive devices. 189 F.3d at 1294. On appeal, after the government confessed error, the Tenth Circuit held that it was plain error to include the inert grenades in the sentence. Citing only *Blackburn*, the court stated: "'Inert' hand grenades, by definition, are not 'destructive devices' nor can they be 'readily assembled' into 'destructive devices.'" 189 F.3d at 1295. The court did not explain what made the grenades "inert" and offered no further reasoning regarding why, in light of the long-standing consensus that an inoperable firearm may still be actionable, an inoperable grenade is not.

Critically, the "grenades" at issue in *Mahone* and *Blackburn* did not contain an explosive charge:  the *Mahone* "grenades" were empty shells and in *Blackburn*, only two grenades contained powder, the other 28 did not.  In contrast, the grenades at issue here are not "inert grenades" as they each contain 6.5 ounces of Composition B high explosives.  In summary, although they reject prosecutions based on non-functional grenades, *Mahone*, *Blackburn,* and *Osuna* are readily distinguishable, in the face of the plain text of § 5845, the First Circuit's consistent endorsement of the principle that a weapon need not be operational to be actionable under the firearms laws, and the presence of high explosive in both grenade bodies.[7]

### B. The Defendant Cannot Show That The M67 Grenades Are Excluded From The "Destructive Device" Definition Based On Their "Design" or "Redesign."

The statute excludes from the definition of a "destructive device" any item "which is neither designed nor redesigned as a weapon."  26 U.S.C. § 5845(f).  Upon a judicial finding that the weapons in this case are "explosive grenades," the defendant may attempt to seek a safe haven in this exclusion.  As shown below, however, a "design" defense offers no refuge here.

---

[7]In *United States v. Sheehan*, 838 F.3d 109 (2d Cir. 2016), the court suggested what may be a middle course between the conflicting propositions that "operability" is never an element in a destructive device case, versus a rigid requirement that a device be shown to function as designed.  In *Sheehan* the Second Circuit acknowledged that a bomb must be shown to be "capable of exploding," but further held that a device that was "incapable of detonating in its ordinary or intended manner (because, for example, it lacks a particular component ordinarily present in such a device)," but is nonetheless "capable of detonating" via other means, was still an "explosive bomb" under the statute.  838 F.3d at 119.  The electrical fuzing system of the pipe bomb in that case was shown to be not fully connected, so the device could not have been detonated via the fuzing system.  However, witnesses testified that the device could still be detonated in other ways, "such as by dropping [it] or by unscrewing an end cap, even though the fuzing system was disconnected." *Id.*  According to the court, that testimony was enough to sustain the conviction.  "That the bomb could not explode in the way its maker might have assumed was the ordinary or even only way in which it could be detonated – *i.e.*, via the fuzing system – because it lacked a particular component of which such a device if ordinarily composed, is irrelevant."  838 F.3d at 119-20.  Here, as will be vividly demonstrated at trial, the M67 grenades could have been caused to detonate using means other than the M213 fuzes with which they were equipped.

The legislative history of the phrase "neither designed nor redesigned for use as a weapon" indicates that the exception was "an affirmative defense; a device which otherwise appeared to fall within the statute would be exempted from its requirements if it could be shown that it was not designed as a weapon." *Posnjak*, 457 F.2d at 1116. "Designed" in this context "refers to objective, physical structure or method of operation and not to intent or schemes of the possessor . . . . Otherwise, the use of 'redesigned' would be meaningless." *Id.* Further, "the word 'designed,' when applied to a manufactured object such as a firearm, refers to what the gun was conceived of and designed for, and not to any modifications made afterwards." *United States v. Gravel*, 645 F.3d 549, 551 (2d Cir. 2011) (holding that firearm stolen by defendant that was modified to fire semi-automatically was originally "designed" to fire automatically and therefore still a machinegun).

As discussed, in the firearms context, courts frequently have held that weapons rendered inoperable were still "designed" to expel a projectile by means of an explosion, and therefore were "firearms" under § 921(a)(3). *See United States v. Dotson*, 712 F.3d 369, 370 (7th Cir. 2013) (affirming conviction where defendant's firearm was inoperable because of significant damage, missing and broken parts, and extensive corrosion, while noting that alteration appeared to be "unintentional"; "[a] gun is still a gun – a weapon designed to expel a projectile by means of explosive action – even though it is in bad condition and can be restored to working condition only by a gunsmith"); *United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005) ("Where a weapon designed to fire a projectile is rendered inoperable, whether on purpose or by accident, it is not removed from the statute's purview; although it is temporarily incapable of effecting its purpose, it continues to be 'designed' to fire a projectile"); *United States v. Yannott*, 42 F.3d 999,

1006 (6th Cir. 1994) (concluding that "the broken firing pin merely temporarily altered the

weapon's capability and did not so alter the weapon's design that it no longer served the purpose

for which it was originally designed").

In the instant case, any attempt to raise an affirmative defense based on "design" would

founder.   Regarding the statute's first listed exception, the grenades here were not "redesigned"

to be something other than weapons, since the grenades were never converted into an object with

a distinct purpose and value. *See United States v. Hammond*, 371 F.3d 776, 781 (11th Cir. 2004)

(in assessing whether armed cardboard tube was "designed" as a weapon, "the critical inquiry is

whether the device, as designed, has any value other than as a weapon"). In other words, by

replacing the grenades' fuzes, the FBI temporarily disabled the devices, but it did not transform

or repurpose them.  Thus, no "redesign" occurred.[8]

Neither can the defendant meet the requirements of § 5845(f)'s second exception, which

excludes any device, "although originally designed for use as a weapon," that is "redesigned" for

use as a "signaling, pyrotechnic, line throwing, safety, or similar device." The language of the

exception contemplates a sword-to-plowshare transformation of a device that was originally

designed as a weapon into a tool with a specific, non-military purpose.  No such "redesign"

occurred here, where live fuzes were replaced with inert ones, but no other modifications were

made, and accordingly the statute's second exception does not apply. *See Oba*, 448 F.2d at 894

("In light of the nature of this device and its admitted purpose," homemade bomb not

---

[8] Moreover, read literally, the statute's "neither/nor" phrasing requires that a defendant who invokes the first exception demonstrate *both* that a given item was not "redesigned" as a weapon, *and* that it was not "designed" as a weapon. 26 U.S.C. § 5845(f) (a "destructive device" "shall not include any device which is neither designed nor redesigned as a weapon"). Here, the defendant has no hope of showing that the grenades were not originally "designed" for use as weapons. *See Gravel,* 645 F.3d at 551-52. Thus, the first listed exception in § 5845(f) is categorically unavailable.

"redesigned" for use as "a signaling, pyrotechnic, line throwing, safety, or similar device");

*Rivera*, 415 F.3d at 287 ("The broken firing pin and the flattened firing-pin channel did not change the design of the weapon.").

Finally, § 5845(f)'s two other exceptions are facially inapplicable.  The grenades in this case were not "surplus ordnance" items "sold, loaned, or given" by the Army under the limitations of 10 U.S.C. §§ 4684(2) (sale of obsolete surplus cannons and cannon balls for parks, monuments, and public buildings), 4685 (loans of obsolete ordnance to State institutions for drill and instruction), 4686 (gifts of obsolete cannons suitable for firing salutes to State homes for soldiers or sailors).  Likewise, the defendant did not seek, nor did the ATF Director make, a ruling that the grenades were excluded from the definition of a "destructive device" pursuant to 27 C.F.R. § 479.24 ("Destructive device determination").

In short, because the grenades were "designed" as weapons and never "redesigned" for use as anything else, and because the other listed exclusions do not apply, the defendant cannot raise a successful affirmative defense under § 5845(f)'s list of exceptions.

## IV.   Conclusion

For the reasons stated, in this case a properly instructed jury could find beyond a reasonable doubt that the M67 grenades with inert fuzes received by the defendant were "explosive grenades" under the NFA, and were not "redesigned" for legitimate use as something other than a weapon.

Respectfully submitted,

JOHN J. FARLEY
Acting United States Attorney

- 15 -

Dated: January 26, 2018                    /s/John S. Davis
                                           John S. Davis
                                           Bar No. 592 (NH)
                                           Assistant U.S. Attorney

                                           Matthew T. Hunter
                                           Bar No. 682921 (MA)
                                           Special Assistant U.S. Attorney

                                           53 Pleasant Street, 4th Floor
                                           Concord, New Hampshire 03301
                                           (603) 225-1552
                                           John.Davis8@usdoj.gov
                                           Matthew.Hunter@usdoj.gov

## CERTIFICATION

I hereby certify that a copy of this Memorandum has been served electronically, through ECF, on Michael D. Ramsdell, counsel for the defendant on January 26, 2018, and will be hand delivered to Edward McLarnon on January 26, 2018.

                                           /s/ John S. Davis
                                           John S. Davis
                                           Assistant United States Attorney