UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:17-CR-00212-SM |
| | ) | |
| EDWARD MCLARNON, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S REPLY AND OBJECTION TO DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANT SENTENCE**

The United States of America, by Scott W. Murray, United States Attorney, and his assistant attorneys John S. Davis and Matthew T. Hunter, objects to the defendant Edward McLarnon's Sentencing Memorandum and Motion for Variant Sentence (Dkt. 149), for the following reasons:

**I.     The PSR Accurately Calculated The Defendant's Base Offense Level to be 33.**

The defendant agrees that the cross-reference in USSG § 2K2.1(c)(1) applies "because the jury found that Mr. McLarnon 'possessed . . . a firearm or ammunition cited in the offense of conviction with ... intent that it would be used . . . in connection with another offense, [the applicable guideline is] § 2Xl.1 (Attempt, Solicitation, or Conspiracy) . . . ." Dkt. 149, at 4 (quoting PSR); *see also id.* at 5.[1] However, the defendant erred in his interpretation of section 2X1.1.

---

[1] The cross references in sections 2K2.1(c) and 2K1.3(c) require application of the attempt guideline based solely on the defendants "intent" to commit another crime with a charged firearm and do not require that the defendant take a substantial step toward the commission of the underlying offense. This reflects the Sentencing Commission's apparent policy goal of punishing defendants who possess particularly dangerous weapons with the intent to use them to commit other crimes as though they had attempted to commit those crimes. Regardless, here, Mr. McLarnon took a substantial step toward committing first degree murder. *See U.S. v. Scognamiglio*, 424 Fed. Appx. 809, 811 (11th Cir. 2011) (defendant took "substantial step toward committing first-degree murder" where he ordered, paid for, and traveled to pick up a silencer and where the defendant, in meetings with a confidential source, said he

Section 2X1.1 provides that the base offense level is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." USSG § 2X1.1(a). In his memorandum, the defendant seems to assert that the "substantive offense" is attempted murder or intent to murder. Dkt. 149, at 4-5. However, the "substantive offense" for purposes of 2X1.1(a) is "the offense that the defendant was convicted of soliciting, attempting, or conspiring to commit." USSG § 2X1.1 application note 2. Thus, for purposes of subsection (a), "the base offense level will be the same as that for the substantive offense" prior to any applicable reductions under subsection (b). *Id.* Here, the jury found that Mr. McLarnon possessed firearms and explosives with the intent to use them to commit first degree murder, which, pursuant to the cross references in sections 2K2.1(c) and 2K1.3(c), is treated as an attempt. Thus, the "substantive offense" for purposes of 2X1.1(a) is first degree murder, which has a base offense level of 43.

The defendant then spends much time arguing that the specific offense characteristics in section 2X1.1(b) apply and would reduce the base offense level by three points because Mr. McLarnon did not take a substantial step toward the commission of the intended crime. Even if Mr. McLarnon did not take such a step (and he did),[2] the specific offense characteristics in

---

would be the triggerman, identified specific victims, and indicated that he had surveyed locations for the murders).

[2] Contrary to the assertion in his memorandum, as the defendant explained in chilling detail to the undercover agent, he had surveilled potential locations for each of his intended murders, going as far as sneaking into Mr. Douglas's office after hours. *See e.g.*, Trial Ex. 212B ("UCE: Have you done any research on where he [David Douglas] is? MCLARNON: Yes, I know exactly where he is that's why I want to do it in his office."); Trial Ex. 215A ("MCLARNON: I've been in his office after hours. UCE: Oh no kidding? MCLARNON: I took cards and everything. UCE: How'd you do that? MCLARNON: I just waited, waited for him to leave and then went in. He leaves his door open with, you can take cards away and, and stuff like that.")

2X1.1(b) do not apply here because the cross reference in 2X1.1(c) directs that "[w]hen an attempt . . . is expressly covered by another offense guideline section, apply that guideline section." Section 2A2.1 expressly covers attempted murder, and therefore the court should apply section 2A2.1, not 2X1.1.  Section 2A2.1(a)(1) provides for a base offense level of 33 because the object of the offense would have constituted first degree murder.  There are no applicable specific offense characteristics under §2A2.1.  Moreover, because "any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two" must be applied "*in the order listed*," the specific offense characteristics in section 2X1.1(b) are inapplicable because of the directive to apply a different guideline section in 2X1.1(c).  *See* USSG § 1B1.1(2) (emphasis added).

Therefore, the PSR correctly calculated the defendant's base offense level to be 33.

## II. The PSR Correctly Considered Former Massachusetts Attorney General Martha Coakley to be an "Official Victim" as Defined in Section 3A1.2.

Section 3A1.2(a) sets out a three-level enhancement if (1) "the victim was . . . a government officer or employee [or] a former government officer or employee" and (2) "the offense of conviction was motivated by such status."  USSG §3A1.2(a)(1)(A), (B), (2).  The

---

While the defendant had not settled on a particular method for how he would kill his other victims, the defendant had identified the victims, the means he would use to kill them, and had identified potential locations for the murders, going so far as to get at least one victim's home address.  *See Scognamiglio*, 424 Fed. Appx. at 811; *see also e.g.*, Trial Ex. 212B ("UCE: What kind of message do you want to send? MCLARNON: (Whispers) I want her dead. . . . I have to find out the new house.  The old house I was going to uh when she either was leaving from the house to the car or from the car to the house that's when I was going to run in and act.  UCE: And you were just going to shoot her with your .38? MCLARNON: No.  More like a spray situation so that. UCE: Smarter. MCLARNON: Yeah.  Right. One is more precise than the other one. UCE: And you're not going to miss. MCLARNON: You only have a small amount of time that you wanna. UCE: Steel on target. MCLARNON: Right."); Trial Ex. 212B ("UCE: Is there a specific judge? MCLARNON: Well, yes.  Ryan helped me get the home address of a judge, but I have to do a lot more research before I actually carry that out."  "UCE: Who do we want this [grenade] for? MCLARNON: The judges have a parking lot below the courthouse so they, they drive right into the courthouse. UCE: (UI).  The Federal one or the? MCLARNON: The federal one.  UCE: Ooh.  Well that's going to rip apart a bunch of cars. MCLARNON: Yeah.").

defendant contends that the official victim enhancement in section 3A1.2 does not apply with regard to former Attorney General Coakley because the defendant's desire to kill AG Coakley "was rooted in [her] status as a private attorney for Deutsche Bank" and not her status as Attorney General. Dkt. 149, at 7.

While the defendant concocted an elaborate conspiracy involving AG Coakley and Judge Saylor working for Deutsche Bank, the evidence demonstrates the defendant targeted each of them because they were "government officer[s] or employee[s]" who, in the defendant's view, had caused him harm by helping the government "steal" his home.[3] *See* USSG §3A1.2, application note 3. For example, in a letter written by the defendant to Martha Coakley in 2014 (while she was Attorney General of Massachusetts), found in the defendant's car the day he purchased a semi-automatic rifle and ammunition to kill her, the defendant asked AG Coakley to help clean up what he saw as corruption in the Attorney General's office. After threatening that "we" may "have to use our Second Amendment rights to protect ourselves and our property from a counterfeiting racketeering scheme operated by lawyers and judges at war with Massachusetts homeowners" the defendant accused Coakley's "Trial Division [of] knowingly representing guilty state actors" that "conspired with Deutsche Bank, their law firms, and [a] convicted robo-signer." Trial Ex. 103, at 2. The Defendant concluded his letter by asking the then-Attorney General: "Is it not incumbent on you to clean up your Consumer Fraud Unit and Trial Division and prosecute them as they overtly conspire with state actors to aid international banks and debt collector law firms operate a criminal enterprise that steal houses from Massachusetts citizens?"

---

[3] *See e.g.*, Trial Ex. 212B ("MCLARNON: Well Martha Coakley who is the Attorney General. UCE: Martha Coakley. MCLARNON: She was the Attorney General of Massachusetts. UCE: That's, that's who you want to? MCLARNON: She's involved with stealing my home. UC: Okay. MCLARNON: She worked for Deutsche Bank. UCE: And how do you want to kill her? MCLARNON: Judge Saylor worked for Deutsche Bank for twenty years.")

4

*Id.* at 3.  And, as noted in the PSR addendum, in a recorded conversation with the CW made prior to the present investigation, the defendant expressed his view of how then Attorney General Coakley was part of a criminal conspiracy involving the Attorney General's office and the mortgage industry.  PSR Addendum ¶ 14.

The defendant did not target every attorney that represented Deutsche Bank or worked for a law firm that did.  Rather, he targeted two government officials who (in his view) were involved in the foreclosure of his home, then looked for a post hoc reason to weave them into a broader conspiracy.  Thus, the official victim enhancement applies with regard to both Judge Saylor and AG Coakley.

For these reasons and the reasons in the PSR, Probation properly applied the official victim enhancement and correctly calculated the defendant's total offense level to be 43.

### III. Neither a Departure nor Variance is Warranted Based on Extraordinary Mental Health Condition.

The defendant requests a variant sentence due to an "extraordinary mental health condition."  Such a variance is not warranted here.  Though styled as a variance, mental condition is a basis of a departure under the Guidelines and courts should consider relevant guideline provisions and policy statements when determining whether a variance is appropriate under Section 3553.  *See* 18 U.S.C. § 3553(a)(4)(A), (a)(5).  For the reasons below, neither a departure nor a variance is warranted based on the defendant's mental condition.

"Mental condition is a discouraged basis for departure under the guidelines, . . . so a departure is warranted only if circumstances are extraordinary" or atypical.  *United States v. Derbes*, 369 F.3d 579, 580 (1st Cir. 2004) (citing USSG § 5H1.3; ch. 5, pt. H, introductory cmt.); *accord United States v. Maldonado-Montalvo*, 356 F.3d 65, 74 (1st Cir. 2003) ("[D]eparture is warranted only if "the defendant's mental condition presents an 'extraordinary' or 'atypical'

5

case."); *see also United States v. Doering*, 909 F.2d 392, 394-95 (9th Cir.1990) (defendant's need for treatment alone is not an adequate ground for departure). In addition, a departure for diminished capacity is prohibited where, as here, the defendant's offense indicate a need to protect the public because the offense involved a serious threat of violence. See USSG § 5K2.13.[4]

The defendant was examined by two psychiatrists and deemed competent to stand trial. Despite these examinations, and purportedly seeing a psychologist for a period of time, Mr. McLarnon has never "been diagnosed with any extreme form of mental disease, such as psychosis or schizophrenia." *Maldonado-Montalvo*, 356 F.3d at 75. And, as demonstrated by evidence presented at trial and the defendant's conduct during the trial that exposed his willingness to hide his conduct and lie to cover it up, the defendant fully understood and continues to understand that what he did and intended to do was wrong. *See United States v. Barton*, 76 F.3d 499, 502 (2d Cir. 1996) (vacating § 5H1.3 departure absent evidence defendant suffered from psychosis, where defendant's sense of morality remained intact, and "[h]e appreciate[d] both the societal and moral constraints of his behavior"); *United States v. Lauzon*, 938 F.2d 326, 333 (1st Cir.1991) (defendant's "borderline intelligence" was not ground for § 5H1.3 departure). Although the defendant has suffered hardship in his life and may well exhibit some symptoms of depression, "nothing in the record . . . suggests that [the defendant's] depression, however unfortunate, rises to the level of the 'extraordinary.'" *Maldonado-Montalvo*, 356 F.3d at 75; *see also Derbes,* 369 F.3d at 583 ("[I]t should be stressed again that

---

[4] *See e.g.*, *United States v. Woods*, 364 F.3d 1000 (8th Cir. 2004) (bank robbery committed by intimidation but no weapon is still a "serious threat of violence"); *United States v. Dela Cruz*, 358 F.3d 623 (9th Cir. 2004) (defendant convicted of making telephonic bomb threats was ineligible for a departure under §5K2.13 because the crime involved a serious threat of violence).

6

our cases are stringent in distinguishing between serious mental health problems and a truly 'extraordinary' case." (citations omitted)).

Moreover, Mr. McLarnon has been incarcerated for over two years and there is no indication that he has not been able to obtain adequate treatment or that he will not obtain any such treatment going forward. *Cf. Maldonado-Montalvo*, 356 F.3d at 74 ("Although the unavailability of an adequate prison-treatment program could conceivably give rise to an 'extraordinary' case, that is not a *sine qua non* for a U.S.S.G. § 5H1.3 departure.").[5]

Put simply, any mental conditions from which Mr. McLarnon may suffer are not extraordinary and therefore do not warrant a departure or variance.

### IV. The Government Agrees that a Variant Sentence of 25 Years is Appropriate Based on the Defendant's Age.

Finally, the Government is sensitive to the fact that Mr. McLarnon is 69 years old, has some health problems, and will likely spend the rest of his life in prison. The Government therefore agrees that a variance from the PSR-calculated sentence of 480 months to a sentence of no less than 300 months, or 25 years, imprisonment may be appropriate on that basis. *See* USSG § 5H1.1. Such a sentence would protect the public by ensuring the defendant's incarceration until he is approximately 90 years old, at which time another "form of punishment such as home confinement might be equally efficient as and less costly than incarceration." *Id.*

---

[5] *See also Derbes,* 369 F.3d at 583 ("BOP is by no means required to tailor a perfect plan for every inmate; while it is constitutionally obligated to provide medical services to inmates, these services need only be on 'a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.'" (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976) and *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987)).

## CONCLUSION

For these reasons, the Government objects to the defendant's memorandum and request for a variant sentence, and respectfully asks that the Court impose a variant sentence of 300 months' imprisonment.

Dated: May 4, 2018

Respectfully submitted,

Scott W. Murray
United States Attorney

By: /s/ Matthew T. Hunter
Matthew T. Hunter
Special Assistant U.S. Attorney
Bar No. 682921 (MA)

John S. Davis
Assistant U.S. Attorney
Bar No. 592 (NH)

United States Attorney's Office
53 Pleasant Street, 4th Floor
Concord, NH 03301
603.230.2573
Matthew.Hunter@usdoj.gov
John.Davis8@usdoj.gov

## Certificate of Service

  I hereby certify that, on this date, service of the above Government's Objection was served on standby counsel Michael Ramsdell via ECF.  A copy will be sent to Edward McLarnon, acting pro se, at the address below via FedEx overnight on May 7, 2018.  A copy has been emailed to United States Probation Officer Sean Buckley.

  Edward McLarnon
  Cheshire County House of Corrections
  825 Marlboro Rd.
  Keene, NH  03431

                    /s/Matthew T. Hunter
                    Matthew T. Hunter
                    Special Assistant U.S. Attorney